**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| STA GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-CV-00381-JRG-RSP |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MOTOROLA SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC. | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STA GROUP LLC, DILLON KANE | ) | |
| GROUP LLC, and INSTANT CONNECT | ) | |
| SOFTWARE LLC, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

**DEFENDANT MOTOROLA SOLUTIONS, INC.'S**
**<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    DISPUTED CLAIM TERMS ............................................................................... 1

    A.    The '830 Patent ....................................................................................... 1

        1.    Order of steps (claim 1) ............................................................. 2

        2.    "wherein the at least one video feed is associated with the selected communication channel … the one or more video feeds being independent of the selected communication channel" ................................................... 5

    B.    The '802 Patent ..................................................................................... 10

        3.    Order of steps ........................................................................... 10

    C.    The '134 Patent ..................................................................................... 14

        4.    "link for multicasting between users in the first domain and users in the second domain" (claim 8) ........................................ 15

        5.    "presence data" (claim 8) ......................................................... 18

        6.    "trunking element" (claim 8) .................................................... 19

        7.    Order of steps (claims 8 and 9) ................................................ 22

    D.    The '664 Patent ..................................................................................... 23

        8.    "media stream[s]" ..................................................................... 23

        9.    "channels" ................................................................................. 25

        10.    "endpoint" ................................................................................. 27

        11.    Order of steps ........................................................................... 28

III.    CONCLUSION.................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Lab'ys v. Andrx Pharms., Inc.*,
    473 F.3d 1196 (Fed. Cir. 2007)..........................................................................28

*AIA Eng's Ltd. v. Magotteaux Int'l S/A*,
    657 F.3d 1264 (Fed. Cir. 2011)..........................................................................27

*Akeva L.L.C. v. Adidas-Salomon AG*,
    208 F. App'x 861 (Fed. Cir. 2006) ...............................................................17, 30

*Allen Engineering Corp. v. Bartell Industries., Inc.* ..........................................................8, 9

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003)..............................................................3, 10, 23

*Atofina v. Great Lakes Chemical Corp.*,
    441 F.3d 991 (Fed. Cir. 2006) ............................................................................24

*BookIT Oy v. Bank of Am. Corp.*,
    817 F. App'x 990 (Fed. Cir. 2020) ....................................................................17

*Cont'l Cirs. LLC v. Intel Corp.*,
    915 F.3d 788 (Fed. Cir. 2019)............................................................................28

*Core Wireless Licensing S.a.r.l. v. Apple Inc.*,
    853 F.3d 1360 (Fed. Cir. 2017)..........................................................................22

*D Three Enters., LLC v. SunModo Corp.*,
    890 F.3d 1042 (Fed. Cir. 2018)..........................................................................30

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012)..........................................................................22

*Free Motion Fitness, Inc. v. Cybex Int'l*,
    423 F.3d 1343 (Fed. Cir. 2005)..........................................................................24

*Goldenberg v. Cytogen, Inc.*,
    373 F.3d 1158 (Fed. Cir. 2004)..........................................................................27

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999)..........................................................................25

*Hytera Commc'ns Co. v. Motorola Sols., Inc.*,
  841 F. App'x 210 (Fed. Cir. 2021) ..................................................................3, 11, 23, 29

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 784 (Fed. Cir. 2021) ...............................................................................27

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001).................................................................................3

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  383 F.3d 1295 (Fed. Cir. 2004)...............................................................................28

*Jardin v. Datallegro, Inc.*,
  No. 08-CV-1462-IEG RBB, 2010 WL 3910481 (S.D. Cal. Oct. 4, 2010) .............................17

*Kyocera Senco Indus. Tools Inc. v. ITC*,
  22 F.4th 1369 (Fed. Cir. 2022) .........................................................................16, 28

*Mass. Inst. of Tech. & Elecs. For Imaging, Inc. v. Abacus Software*,
  462 F.3d 1344 (Fed. Cir. 2006)...............................................................................21

*Meds. Co. v. Mylan, Inc.*,
  853 F.3d 1296 (Fed. Cir. 2017)..................................................................16, 18, 28

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005)............................................................9, 10, 21, 28

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
  764 F.3d 1392 (Fed. Cir. 2014)..........................................................................11, 28

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014).................................................................................................5, 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)..........................................................................25, 26

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)..........................................................24, 26

*SimpleAir, Inc. v. Google, Inc.*,
  No. 2:13-CV-0937-JRG, 2015 WL 1906016 (E.D. Tex. Apr. 27, 2015) ...................18, 19, 20

*Suprema, Inc. v. ITC*,
  626 F. App'x 273 (Fed. Cir. 2015) ...........................................................................13

*Suprema, Inc. v. ITC*,
  742 F.3d 1350 (Fed. Cir. 2013).................................................................................13

*Techno View IP, Inc. v. Oculus VR, LLC,*
     No. CV 17-386-VAC-CJB, 2018 WL 4141032 (D. Del. Aug. 30, 2018) ..............................17

*Trs. of Columbia Univ. v. Symantec Corp.,*
     811 F.3d 1359 (Fed. Cir. 2016).........................................................................5, 8, 25

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,*
     200 F.3d 795 (Fed. Cir. 1999)................................................................................25

*Wi-Lan, Inc. v. Apple, Inc.,*
     811 F.3d 455 (Fed. Cir. 2016)................................................................................29

*Williamson v. Citrix Online, LLC,*
     792 F.3d 1339 (Fed. Cir. 2015)..............................................................................21

*WSOU Invs. LLC v. Google LLC,*
     No. 2022-1066, 2023 WL 6210607 (Fed. Cir. Sept. 25, 2023) ...........................................6, 8

## TABLE OF EXHIBITS

*Unless otherwise noted, all exhibits below are excerpts of the text cited therein.*

| Exhibit No. | Description |
|:---:|---|
| A | 11/11/2014 Remarks from '830 Patent File History |
| B | 9/24/2023 Declaration of Dr. Kevin C. Almeroth regarding Claim Construction |
| C | 12/31/12 Remarks from '830 Patent File History |
| D | US 2008/0036851 A1 to Patel |
| E | 4/10/2013 Notice of Allowance from '134 Patent File History |
| F | US Patent No. 7,836,183 to Barnett |
| G | IEEE Journal on Selected Areas in Communications, Vol. 22, No. 7 (Nov. 2004) |
| H | Comparisons of Conventional and Trunked Systems (May 1999) |
| I | Microsoft Computer Dictionary, 4th Edition (1999) |
| J | Microsoft Computer Dictionary, 5th Edition (2002) |

## I.     INTRODUCTION

There are eleven disputed claim terms across the four asserted patents in this case. Only Motorola's proposed constructions are consistent with the claim language, the specification, and the file history, and accurately reflect the way a person of ordinary skill in the art ("POSA") would have understood them. STA repeatedly ignores express definitions in the specification, reads words out of the claims, and attempts to walk back limitations the applicants added during prosecution. Moreover, STA does not offer a single construction for any term, and at best only vaguely suggests what the "plain and ordinary meaning" is for certain terms, including when the specification provides an express definition that STA refuses to adopt. For the reasons explained below, the Court should adopt Motorola's proposed constructions.

## II.     DISPUTED CLAIM TERMS

### A.     The '830 Patent

The '830 Patent describes a filtering process involving video feeds that ensures that a user of a mobile communication device (such as a radio) only receives video feeds relevant to that user. In an example from the patent, when a group of emergency responders (e.g., firemen) "approach a location from which specific video feed [sic] is originating (e.g., a video feed from a camera 122 pointed at a junction towards which a fire-truck is heading[)]," a "policy module" "may automatically associate the video feed" "with the communication channels of the fire truck…." '830 Patent, 6:3-12. The original independent claims were rejected several times during prosecution, and ultimately allowed only after the applicant added requirements relating to the display and selection of a "frequency," in addition to a channel, on the mobile communication device. Ex. A (11/11/14 Remarks) at 2, 5, 7, 11.

### 1.    Order of steps (claim 1)

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | The "providing a plurality of radio frequencies…" step and the "monitoring a selection of a radio frequency" step must be performed before the "identifying …" step |

Claim 1 requires that the two radio frequency steps—"providing a plurality of radio frequencies on a display…" ([1b]) and "monitoring a selection of a radio frequency" ([1c]) from among those shown on the display—occur ***before*** the "identifying…" step ([1d]). The parties have already agreed that the separate step of "monitoring a selection of a communication channel" must occur before the "identifying…" step. Dkt. 132 at 2. The logic and grammar of the claim and the intrinsic evidence also require that the radio frequency steps occur before the "identifying…" step.

The claim language imposes the order reflected in Motorola's proposed construction. As shown in the annotated claim below, the "identifying…" step (1[d]) recites identifying a video feed from "**the** plurality of video feeds," and the two radio frequency steps (1[b] and 1[c]) provide the only antecedent basis for this phrase. Specifically, the step of "providing a plurality of radio frequencies on a display" (1[b]) defines that each radio frequency is "associated with a geographic zone" which is also the source of "a plurality of video feeds." The next step of "monitoring a selection of a radio frequency" (1[c]) then specifically selects one displayed radio frequency, which, by virtue of the prior "providing," is a frequency associated with "a geographic zone" and "a plurality of video feeds." It is this "plurality of video feeds" sourced from the geographic zone and associated with the selected radio frequency that provides the antecedent basis for "**the** plurality of video feeds" in the next "identifying…" step (1[d]).

> 1. A method comprising:
>
> 1[**a**] monitoring a selection of a communication channel by a user of a mobile communication device;
>
> 1[**b**] <u>providing</u> **a plurality of radio frequencies on a display** of the mobile communication device, **each radio frequency being associated with a geographical zone from which a plurality of video feeds** associated with the geographic zone are sourced;
>
> 1[**c**] <u>monitoring</u> **a selection of a radio frequency** of the plurality of radio frequencies by the user[;]
>
> 1[**d**] <u>identifying</u> **at least one video feed by selecting the at least one video feed from <u>the</u> plurality of video feeds associated with the geographic zone**, wherein the at least one video feed is associated with the selected communication channel based on a user policy that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel, the one or more video feeds being independent of the selected communication channel; and
>
> providing access to the identified at least one video feed to the mobile communication device based on the user policy.

The Federal Circuit has repeatedly recognized that antecedent basis such as the above imposes an order of steps, consistent with Motorola's construction. *Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218 (Fed. Cir. 2021) ("[T]he fact that the 'determining' step says 'the' when it could have said 'a' reinforces our conclusion that it is meant to come after the 'preparing' step."); *see also Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003) (citing *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001)).

Because the claim language is clear, the specification need not be consulted. *Hytera Commc'ns*, 841 F. App'x at 218. Nonetheless, here the specification is consistent with the claim language. Figures 9 and 10, the only embodiments in the '830 Patent related to the claimed frequency limitations, depict the same order of steps. As shown below, a user interface first displays frequencies and then, upon selection of a frequency by a user, the plurality of video feeds is displayed from which to identify a specific feed:



*See* '830 Patent, Figs. 9-10 (annotated), 9:60-11:2. In connection with these figures, the specification repeatedly describes (1) displaying and selecting a frequency; and (2) then identifying a video feed from the feeds associated with the selected frequency. *Id.*, 10:27-31 (describing [1] a user altering frequency on user interface of Figure 9, followed by [2] displaying video feeds on the user interface), 10:54-59 (describing [1] selection of a frequency from a drop-down menu displayed on a user interface, such as in Figure 9, followed by [2] display of video feeds from which to identify the video feed).

STA's arguments ignore this intrinsic evidence. First, STA contends that "[n]othing in the identifying step is dependent on any portion of the monitoring step." Dkt. 159 ("STA Br.") at 6. But that ignores the dependency resulting from the antecedent basis of "the plurality of video feeds," highlighted above. Second, STA argues that portions of the specification describe identifying a video feed in "various orders" compared to monitoring and selecting a frequency. STA Br. at 6. But the portions cited by STA have nothing to do with the frequency limitations recited in the claims at issue here. *See id.* (citing '830 Patent, 6:3-17 (a policy module 312), 7:39-42 (use by public safety and first responders)). Confusingly, STA even appears to argue that the patent allows for selecting a "channel" *after* identifying a video feed (*id.* (citing '830 Patent, 8:16-

33, 6:43-56)) even though STA has already agreed that channel selection (a separately recited step) must occur **before** the step of identifying the video feed. *See* Dkt. 132 at 2 (agreed constructions).

STA identifies no portion of the specification that justifies ignoring the natural and grammatical order of these steps in claim 1, and Motorola's construction should be adopted.

> 2. **"wherein the at least one video feed is associated with the selected communication channel … the one or more video feeds being independent of the selected communication channel"**

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

The unrebutted evidence demonstrates that a POSA[1] would not have understood this claim limitation with reasonable certainty, because it requires a "video feed" to be both "associated with" **and yet at the same time** "independent of" the "selected communication channel." "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Under this standard, claims are indefinite when, as properly construed, they are "nonsensical." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1367 (Fed. Cir. 2016). Here, claim 1 of the '830 Patent is nonsensical on its face, and neither the specification nor prosecution history offer any explanation to escape the nonsensical claim language.

The relevant language of claim 1, excerpted below, recites, among other things, two separate components—(1) "at least one video feed" (also referred to as "one or more video feeds") and (2) a "selected communication channel"—and specifically requires that the at least one video

---

[1] Motorola does not agree with STA's definition of the level of ordinary skill in the art, STA Br. at 4, including STA's position that this level is the same for all of the asserted patents. That said, Motorola does not believe the differences in the parties' positions have a material impact on these particular claim construction disputes.

feed be "associated with" *and* "independent of" the selected communication channel *at the same time* (the time of the step of "identifying at least one video feed"):

> identifying at least one video feed by selecting the at least one video feed from the plurality of video feeds associated with the geographic zone, **wherein <u>the at least one video feed</u> is associated with the selected communication channel based on a user policy** that identifies one or more video feeds that are relevant to the user when the user accesses the selected communication channel, **<u>the one or more video feeds</u>** being **independent of** the selected **communication channel**; and

'830 Patent, cl. 1. The only context in the claim for determining association or independence between the separate components is whether a "user policy" "identifies" that the video feed is "relevant" (or not relevant) to the accessed communication channel. The claim however does not explain with reasonable certainty how a user policy identifies a video feed "that [is] relevant to" the user accessing the selected channel, while also "being independent of" that same channel. Accordingly, a POSA is left guessing as to claim scope "because it is unclear how the identified video feed and selected communication channel can at the same time be both 'associated' with each other and yet 'independent' of each other." Ex. B (Almeroth Dec.), ¶ 31.

The specification provides "no further explanation to escape the nonsensical" plain meaning. *WSOU Invs. LLC v. Google LLC*, No. 2022-1066, 2023 WL 6210607, at *7 (Fed. Cir. Sept. 25, 2023). In fact, the patent does not describe "one or more video feeds" "independent of the selected communication channel" at all, much less how the video feeds and communication channel can be both associated with and independent of each other at the same time. Ex. B (Almeroth Dec.), ¶ 32. The only instances of the word "independent" in the specification refer to devices "independent" of each other, not a "video feed" independent of a "communication channel." *See* '830 Patent, 3:3-29 (describing "independent video surveillance cameras (e.g., surveillance cameras installed along freeways, at traffic intersections or and [sic] public and non-

public locations," "independent voice communication devices," and "independent video surveillance cameras," but not how a video feed can be independent of a communication channel), cl. 2 (describing "independent video feeds in a network" but not how a video feed can be independent of a communication channel); Ex. B (Almeroth Dec.), ¶ 32.

Instead, like the claim language, the specification describes the relationship between a video feed and a communication channel based on relevance of the video feed to a user of the channel. For example, the specification describes association (or no association) between video feeds and channels if the "video feeds" are (or are not) "relevant to a particular [virtual talk group]" hosted on that channel. *E.g.*, '830 Patent, 5:43-48. This is the only possible context in the patent for determining whether a video feed is "independent" of a communication channel. Ex. B (Almeroth Dec.), ¶ 32. But because these two states are mutually exclusive (a video feed is relevant or it is not), a POSA is left guessing as to what it means for a video feed to be ***both*** associated with and independent of the selected communication channel at the same time, as recited in claim 1.

The file history only amplifies the ambiguity. During prosecution, the applicants added the "independent" requirement to distinguish prior art, including the Patel reference. Ex. C (12/31/12 Remarks) at 9. The applicants emphasized that Patel's description of a user of a wireless communication device selecting a channel associated with television content (video feed) is different than "'the one or more video feeds being independent of the selected communication channel.'" *Id.* (describing Patel as "merely disclos[ing] 'obtaining/viewing television content'" when a "user presses the buttons…to select the desired television channel"); Ex. D (Patel), ¶¶ 22-24. To the extent a POSA would have understood this distinction, he would have understood it to mean that, because the video feed (television content) and channel are already associated, they cannot be independent. Ex. B (Almeroth Dec.), ¶¶ 33-34. Thus, like the patent, the prosecution

history describes "independent of" and "associated with" as mutually exclusive concepts, but, critically, nowhere does the intrinsic record explain how they can occur simultaneously. *Id.*

The impossible condition created by claim 1 of the '830 Patent is precisely the type of nonsensical claiming the Federal Circuit has found indefinite. In *Allen Engineering Corp. v. Bartell Industries., Inc.*, the Federal Circuit found indefinite claims that required pivoting "its gear box ***only*** in a plane ***perpendicular*** to said biaxial plane," where the specification stated that the "gearbox … ***cannot*** pivot in a plane ***perpendicular*** to the biaxial plane." 299 F.3d 1336, 1349 (Fed. Cir. 2002) (emphasis in original). Similarly, in *WSOU Investments*, the Federal Circuit determined that the phrase "second part in between the first part and the second part" was nonsensical because it "does not allow a reader to differentiate the first instance of 'a second part' from the second." 2023 WL 6210607, at *3, *7. And in *Trustees of Columbia University*, the Federal Circuit analyzed "claims [that] describe the step of extracting machine code instructions from something that does not have machine code instructions," holding "the claims [] nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite." 811 F.3d at 1367. The same reasoning applies here: the claims require the video feeds be simultaneously "independent of" and "associated with" the selected communication channel, and the specification provides no guidance on how that would be accomplished.

Instead of confronting the intrinsic evidence, STA tries to explain the claim via hypotheticals in various unrelated contexts, such as neurology (independence of right and left human extremities), education (whether an alumnus is independent of his alma mater), and witness bias (whether an independent expert is independent of his client). STA Br. at 8-9. But the question is not whether a video feed can be independent of a communication channel by ***any measure*** or in ***any context***. *Nautilus* and its progeny ask whether the claim scope is reasonably certain ***in the***

*specific context of the patent*. STA's hypotheticals are irrelevant.

STA also argues that Motorola ignores the "user policy" limitation of claim 1. STA Br. at 10. To the contrary, as described above, the "user policy" limitation provides context for determining association *or* independence but says nothing about how a video feed can be both associated with and independent of the selected communication channel at the same time. Likewise, the portion of the specification STA cites is also not relevant; it describes association of a video feed and communication channel but not a video feed that is both associated with and independent of the selected communication channel at the same time. *Id.* (citing 5:60-6:17). STA cannot point to any example in the specification or articulate (through attorney argument or even expert testimony) any circumstance where such a paradoxical situation could exist.

STA also circularly argues that the claim has "no ambiguity" because it purportedly "plainly states that the user policy associates channels and media streams that are *otherwise* independent," and refers to independence as something *other* than "not associated." STA Br. at 7, 8-9.[2] The Federal Circuit has expressly rejected such *post hoc* revisions to preserve validity. *Allen Eng'g., Inc.*, 299 F.3d at 1349 (rejecting argument "that one of skill in the art would understand that the term 'perpendicular' in the claim should be read to mean 'parallel'"). By interpreting "independent" to mean anything other than associated, STA also effectively reads "independent" out of the claim, a result the Federal Circuit rejects. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all terms of the claim is preferred over one that does not do so.").

Because the claim is nonsensical in view of the intrinsic record, and STA offers no proper interpretation that resolves the ambiguity, it should be found indefinite.

---

[2] All emphasis added unless stated otherwise.

## B.     The '802 Patent

The '802 Patent is directed to managing radio messages in a communication system. As described in the patent, prior-art systems assigned groups to different dedicated radio channels; for example, the fire department could "allocate one channel to every school." '802 Patent, 1:18-36. Conventionally, when two messages from two different channels arrived at the same time, an operator would prioritize one and mute all others. *Id*. Muting all other channels would avoid "garbled communication," but also result in missing messages on the muted channels. *Id*. The purported improvement of the '802 Patent is a basic concept: when two messages arrive at the same time, instead of just muting one of them, the patent teaches to listen first to the higher priority message, store the other message, and play it later. *See, e.g.*, *id.*, Abstract.

### 3.     Order of steps

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | The steps must be performed in the recited order. |

Here, both the plain language of claim 1 and the specification require that at least the following limitations be performed in their recited order. *Altiris*, 318 F.3d at 1369-70.

**Limitation 1[c][3] ("determining one or more priorities") must be performed *after* limitations 1[a] and 1[b] (receiving first and second messages)**. The language of claim 1 itself, annotated below, dictates as a matter of logic and grammar that this must be the case:

---

[3] For ease of reference, Motorola adopts the claim limitation numbering for claim 1 of the '802 Patent set forth by STA in its opening brief. *See* STA Br. at 11.

[1a:] **receiving a first message on a first dedicated channel** from amongst the plurality of channels at the communication system, the plurality of channels being dedicated to different entities, the first dedicated channel being dedicated to receiving messages from a first entity;

[1b:] **receiving a second message on a second dedicated channel** being dedicated to receiving messages from a second entity from amongst the plurality of channels at the communication system, the second message overlapping with the first message in time;

[1c:] **determining one or more priorities for the first message received on the first dedicated channel** from the first entity **and the second message received on the second dedicated channel** from the second entity based on at least one pre-defined parameter;

Specifically, limitation 1[c] twice uses the antecedent basis article "the" and the past tense "received" to unambiguously require that determining priorities for "***the*** first message receiv***ed*** on the first dedicated channel" and "***the*** second message receiv***ed*** on the second dedicated channel" must occur after those messages have been received. *Hytera Commc'ns*, 841 F. App'x at 218 (reinforcing when antecedent basis compels order of steps); *Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1398-1400 (Fed. Cir. 2014) ("As a matter of logic, a mailbox must be established before the contents of said mailbox can be transmitted.").

The specification confirms that the claimed step 1[c] of "determining one or more priorities" occurs after the messages are received in steps 1[a] and 1[b]. The specification explains with reference to Figure 3 (annotated below) that the determination of priority (step **310**) occurs only after both the first (step **302**, red) and second messages (step **304**) are received and, in fact, only if the first and second message are overlapping (step **306**):

11



'802 Patent, Fig. 3 (annotated); *see also id.*, 4:41-67 ("At step 306, a check is performed to verify if the second radio message overlaps with the first radio message in time….[I]n case overlapping is identified at step 306, step 310 is performed."). Indeed, the entire purpose of the invention, according to the specification, is to address a scenario where "[t]he ***receipt*** of ***multiple radio messages at one time*** creates confusion for an operator." *Id.*, 1:13-41. To that end, the specification explains that "***if*** incoming radio messages ***overlap in time*** the message audio portions ***can be prioritized***"—again, in the past tense—"and played back on the basis of the priority and the time of receipt." *Id.*, 1:50-52. STA's argument that the messages need not be received before their priority is determined is also belied by its own prior characterization of the '802 Patent to this Court: "the '802 Patent addresses the problems of channel interference, garbled overlapping messages, and/or missing an important message ***by determining priorities of incoming messages*** based on predefined parameters and then sequencing the order of their presentation based on their priorities." Dkt. 28 at 12.

**Limitation 1[d] ("determining which message … should be stored and subsequently played") must be performed *after* limitations 1[a] and 1[b] (receiving first and second messages), and *after* limitation 1[c] ("determining one or more priorities")**: Logic and

grammar also dictate that the "determining" step of 1[d] must be performed **after** steps 1[a]-1[c] at least because step 1[d] recites that this determination is "**based on** the second message **overlapping** with the first message in time and **one or more priorities assigned to the first and second message**." STA does not dispute that limitation step 1[d] must be performed after steps limitations 1[a]–1[c]. That the messages overlap in time (and thus, necessarily, have been received as in [1a] and [1b]), and have been assigned a priority via the determining step 1[c] are necessary preconditions to determining which to play and which to store in step 1[d]. *Suprema, Inc. v. ITC*, 742 F.3d 1350, 1370 (Fed. Cir. 2013) (holding that quality checks in steps (d) and (e) of claimed method must precede step (f) where step (f) required a determination **based on** the quality checks of steps (e) and (d)).[4] The specification also confirms this requirement. *See* '802 Patent, Fig. 3 (step 312 identifies the radio message with the highest priority after the messages have been received (steps 302, 304), and after the priorities have been calculated (step 310); after step 312, the message with the highest priority is played (step 314) and the other messages are stored (step 316)), 4:54–67.

   **Limitations 1[e] ("playing the message having the higher priority") and 1[f] ("storing at least one message having a lower priority") must be performed *after* limitations 1[a]-1[d]**: For the same reasons as above, logic and grammar dictate that before playing the higher priority message and storing the lower priority message, both messages must first have been received (steps 1[a]-1[b]), their priorities determined (step 1[c]), and which to play and which to store is determined (step 1[d]). The specification confirms this requirement. '802 Patent, Fig. 3, 4:54-67.

   STA does not dispute steps 1[e] and 1[f], individually, must be performed after steps 1[a]-

---

[4] Although *Suprema* was vacated en banc, 796 F.3d 1338 (Fed. Cir. 2015) (en banc), this portion of the opinion was reinstated by the panel on remand. *See Suprema, Inc. v. ITC*, 626 F. App'x 273, 276 (Fed. Cir. 2015).

1[d]. STA argues, however, that step 1[e] need not occur before step 1[f]. STA Br. at 12. In other words, STA appears to argue that steps 1[e] and 1[f] are either performed simultaneously or sequentially. But steps 1[e] and 1[f], in fact, must happen simultaneously. The claim language requires that the received first and second messages "overlap in time." *See* '802 Patent, step 1[b]. Since the claim recites that the messages "overlap in time," one of the messages must necessarily be stored while the other message is playing. The specification confirms this, explaining that "[i]n case of overlap of the incoming radio messages in time, the radio message with the highest priority is played first, *while* the remaining radio messages are *stored* in a queue." '802 Patent, 1:52-55; *see also id.*, Abstract (same); Fig. 3; 4:64-5:18. There is nothing in the specification that explains or otherwise supports a construction where the "playing" step 1[e] occurs after the "storing" step 1[f] for overlapping messages.

**Limitation 1[g] ("playing the stored message subsequent to completing playing") must be performed *after* limitations 1[a]-1[f]**: STA does not dispute that step 1[g] must be performed after limitations 1[a]-1[f]. The express language of step 1[g] requires that the message have already been "stored" (step 1[e]) and that "stored" message be played "subsequent to completing playing" of the first message (step1[e]). *See also* '802 Patent, Fig. 3; 4:54-67.

Thus, MSI's construction requiring the recited sequence of steps should be adopted.

### C.     The '134 Patent

The '134 Patent is directed to a system in which users in multiple network domains are connected over satellite, so that users in each domain can communicate with each other. '134 Patent, 1:66-2:20. The purported improvement has numerous requirements, including establishing a satellite link between domains when users are present; allocating, increasing, and adjusting bandwidth for the satellite link in view of multiple conditions; and tearing down satellite links between domains based on user absence. *Id.*, 3:27-29.

4.      **"link for multicasting between users in the first domain and users in the second domain" (claim 8)**

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "satellite link that simultaneously delivers information between a group of users in the first domain and a group of users in the second domain using the most efficient strategy" |

There are two disputes regarding this term: (1) whether the claimed "link" is a "satellite link," and (2) whether the '134 Patent defines "multicast[ing]" as "refer[ring] to the delivery of information to a group of destinations simultaneously using the most efficient strategy." The answer to both is unequivocally "yes."

There can be no credible dispute that "a link" as recited in the claim is a "satellite link." The relevant portion of claim 8 explicitly states that "***the link*** is a satellite communication link":

> 8. A method to be executed in conjunction with a processor to perform the steps of, comprising:
>
> *       *       *
>
> determining to establish ***a link*** for multicasting between users in the first domain and users in the second domain based on presence data of at least one user in the first domain and at least one user in the second domain;
>
> determining an application to be used in a communication session over ***the link***;
>
> allocating a bandwidth level to be used for ***the link*** to accommodate the application;
>
> increasing the bandwidth level for ***the link*** based on a change in the application and based on an identification of additional presence data for additional users that have joined the communication session…;
>
> *       *       *
>
> tearing down ***the link*** based on the absence; wherein ***the link is a satellite communication link***.

'134 Patent, cl. 8 (excerpted). During prosecution, the claimed "link" was expressly narrowed to a "satellite communication link" by a claim amendment after an examiner interview, and the claims were allowed as a result. *See* Ex. E (April 10, 2013 Notice of Allowance). Motorola's proposed

construction merely clarifies that the "link" recited throughout the claim must be this same "satellite link," as required by the language in the claim and the prosecution history.

Although it appears that STA *agrees* that the "link" is a "satellite link," by referring to Motorola's construction as "duplicative" and "redundan[t]" of the last limitation in claim 8, STA inexplicably maintains that this construction is "improper" because it is "potentially confusing." STA Br. at 13. But STA fails to explain how this construction could create confusion. Quite the opposite, Motorola's proposed construction will make clear for the jury that the claimed "link for multicasting" must be a "satellite link," and not some other communication link. STA also incorrectly argues that Motorola's construction "requir[es] the court to interpret 'link for multicasting' to mean 'satellite link'" without more. STA Br. at 13-14. That is not correct and conflates the two disputes regarding this term. The fact that the claim language narrows the "link" to a "satellite communication link" is a separate issue from the meaning of "multicasting."

With respect to the second dispute regarding "multicasting," the '134 Patent expressly defines "multicast:" "'*Multicast' refers to* the delivery of information to a group of destinations simultaneously using the most efficient strategy." '134 Patent, 1:14-16 (quotes in original). The Federal Circuit has held repeatedly that an applicant defines a term where, as here, the disputed term is in quotes followed by "refers to." *Meds. Co. v. Mylan, Inc.*, 853 F.3d 1296, 1300 (Fed. Cir. 2017) ("As used here, 'batch' or 'pharmaceutical batch' refers to material produced by a single execution of a compounding process of various embodiments of the present invention."); *see also Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1378 (Fed. Cir. 2022) (finding "referred to herein" to be definitional). STA does not (and cannot) cite any authority finding that similar language is not definitional.

STA argues that the Court should not adopt this definition of "multicast" because another

paragraph in the patent refers to "IP Multicast" as "sending one message to many recipients." STA Br. at 14-15 (citing '134 Patent, 1:20-21). But the term "*IP M*ulticast" is different from the term in dispute here, and should not limit the applicants' lexicography for the term "multicast."

Nor does the fact that the definition of "multicast" appears in the "Background of the Invention" undermine Motorola's proposed construction, as STA argues. STA Br. 15. Numerous courts have found the applicant acted as its own lexicographer by defining the term in similar "background" sections of the specification. *See, e.g.*, *Techno View IP, Inc. v. Oculus VR, LLC*, No. CV 17-386-VAC-CJB, 2018 WL 4141032, at *3 (D. Del. Aug. 30, 2018) ("Plaintiff's construction (the part that comes from the 'Background of the Invention' section) … [is] preceded by phraseology typically indicating that a definition is to follow…."); *Jardin v. Datallegro, Inc.*, No. 08-CV-1462-IEG RBB, 2010 WL 3910481, at *4 (S.D. Cal. Oct. 4, 2010) ("The Court agrees with Defendants that Plaintiff acted as his own lexicographer by defining "database" in the [Background of the Invention of the] specification.").

STA also cites to another portion of the specification describing applicants' intent not to limit scope. STA Br. 15 (citing '134 Patent, 2:31-40). But that statement of intent, if anything, refers to information in subsequent paragraphs ('134 Patent, 2:41-62) and does not recant or disclaim the express definition in the patent's background. STA cannot ignore a plain lexicographic statement and "revise its invention to suit current litigation needs." *BookIT Oy v. Bank of Am. Corp.*, 817 F. App'x 990, 994 (Fed. Cir. 2020); *Akeva L.L.C. v. Adidas-Salomon AG*, 208 F. App'x 861, 863 (Fed. Cir. 2006) (finding "catch-all" phrase at end of specification cannot be used to capture broad claim scope).

The "link for multicasting" should be construed according to the express language of the claim and the definition in the patent.

### 5.     "presence data" (claim 8)

| STA's Proposed Construction | Motorola's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "a status indicator that conveys an ability and/or willingness of a potential communication partner to communicate" |

The patent defines the term "presence data." Specifically, to explain the meaning of this disputed term, the specification states that "[i]n regards to 'presence' data more generally, presence information *is* a status indicator that conveys an ability and/or willingness of a potential communication partner to communicate." '134 Patent, 6:41-45 (quotes in original).

STA concedes in its brief that this language rises to the level of lexicography. *See* STA Br. at 17 ("The applicant labeled this *definition*…"). However, STA's position is that this definition applies only to "presence *information*," but not "presence *data*." STA Br. at 17. This is a red herring. There is not a dispute regarding the meaning of the word "data." Moreover, STA does not identify any substantive difference between "data" and "information." Nor could it. "Data" is simply the plural form of "datum," i.e., information. *See SimpleAir, Inc. v. Google, Inc.*, No. 2:13-CV-0937-JRG, 2015 WL 1906016, at *7 (E.D. Tex. Apr. 27, 2015) (construing "*data*" to mean "any type of digital *information* suitable for digital transmission or computer use"). Moreover, the phrase "more generally" in the definition of presence data or information is intended to distinguish that definition from how the presence data is "exchanged," as described in the prior sentence, and does not undermine the clear lexicographic intent. '134 Patent, 6:41-45. Again, just like in *Meds. Co.*, the applicant put quotation marks around the term being defined, which in this case is "presence" data or information, and the definition thus should apply. 853 F.3d at 1300.

Accordingly, the Court should construe "presence data" consistent with the express definition in the patent.

### 6. "trunking element" (claim 8)

| STA's Proposed Construction | Motorola's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "software and/or hardware in the communication resource manager that establishes, tears down, and controls the bandwidth of the satellite link" |

The parties dispute whether the word "trunking" in the term "trunking element" should be completely read out of the claim, as STA proposes, or afforded its plain and ordinary meaning in light of the intrinsic record, as Motorola proposes. As explained below, Motorola's construction is consistent with the plain and ordinary meaning of "trunking" and properly gives meaning to all the words in the claim. STA's construction, on the other hand, effectively deletes the word "trunking" from the claim, leaving nothing more than an "~~trunking~~ *element* that is automatically configured for selecting a transcoding."

    a) *Motorola's Construction Accurately Reflects the Plain and Ordinary Meaning*

The parties appear to agree that the function of a "trunking element" is to perform "trunking," but disagree on what "trunking" is. The claims plainly require numerous computer-implemented processes including "establish[ing] a link," controlling the bandwidth of the link by "allocating," "increasing," and "adjusting" the bandwidth, and lastly "tearing down the link." '134 Patent, cl. 8. And where claim 8 uses the term "link," the specification consistently confirms that the "trunking element" is what establishes, controls, and tears down the link. Those are the steps performed by "trunking." For example, the title and specification both refer to the alleged invention as "presence based trunking" in a network. '134 Patent, Title, 1:7-9. According to the specification, a known "dynamic trunk configuration" brings up a link dynamically but the "trunking system" of the alleged invention "reserves and brings-up expensive trunks only when needed." *Id.*, 2:51-62. The specification also describes the "dynamic trunking elements 50 and 52" as the components that "bring up the SatCom link," "increase the bandwidth of the link," and

"bring[] down the SatCom link." *Id.*, 4:33-49.

Extrinsic evidence also confirms Motorola's construction reflects the plain and ordinary meaning of "trunking." For example, the art describes that "[t]he difference in a trunked radio system vis-á-vis a conventional system is that the radio frequencies are dynamically allocated during use. As such, a conversation between a dispatcher and a fleet of patrol cars, for example, can change from frequency to frequency within the trunked group of frequencies during the course of a conversation." Ex. F, U.S. Patent No. 7,836,183 ("Barnett"), 2:1-9. A paper entitled "Analysis of Public Safety Traffic on Trunked Land Mobile Radio Systems" published in 2004 describes "trunked systems" as "where a number of user groups dynamically share a pool of radio channels, were developed to conserve spectrum." Ex. G, IEEE Journal on Selected Areas in Communications, Vol. 22, No. 7 (Nov. 2004) at 1198. And as stated in a 1999 paper describing known trunking systems, "a trunk is a shared voice or data traffic path between two points," and "[t]runked systems use access control schemes to share channel capacity among many users." Ex. H, Comparisons of Conventional and Trunked Systems, May 1999, at 9. Some trunking systems include "some type of access control (whether in each mobile unit or centralized at a base station site)." *Id.* at 10. When a user wants to contact other users, the user receives an indication of an available channel from a controller, and all the users (transmitting and receiving) all switch to that channel for communication. *Id*. These disclosures reflect the plain and ordinary meaning that a "trunking element" establishes a link between users, and, when the users are finished communicating, the trunking system tears down the link.

> b) *STA's Construction, If Adopted, Is Subject to 35 U.S.C. § 112 ¶ 6.*

STA argues that the "trunking element" does nothing more than "automatically … select a transcoding based on available bandwidth." STA Br. at 18. As explained above, this is incorrect. STA's construction merely parrots the language of claim 8 and gives no meaning to "trunking"

whatsoever. *Merck & Co.*, 395 F.3d at 1372 (claim construction must give meaning to all terms). However, to the extent the Court agrees with STA, that construction squarely implicates 35 U.S.C. § 112 ¶ 6. STA's construction reads "trunking" out of the term completely, leaving the term "element" (with or without "trunking" preceding it), a nonce term that is devoid of structure, along with the functional language "selecting a transcoding based on available bandwidth." As a result, under STA's interpretation, "trunking element" is a purely functional term that should be construed under § 112 ¶ 6 and limited to the corresponding structure in the specification. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (finding presumption that § 112 ¶ 6 does not apply if the claim does not literally use the word "means" is no longer "strong" or "heightened" and is easily overcome when "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function'") (citation omitted); *Mass. Inst. of Tech. & Elecs. For Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("The generic terms 'mechanism,' 'means,' '*element*,' and 'device,' typically do not connote sufficiently definite structure.").

Here, the structure in the specification is consistent with Motorola's construction— software or hardware in the communication resource manager that (1) establishes, (2) tears down, and (3) controls the bandwidth of the satellite link. The specification, for example, describes the "trunking element" as a black box of "[s]oftware and/or hardware (inclusive of memories and processors that can execute any software application) [that] may reside in … dynamic trunking elements 50 and 52." '134 Patent, 6:8-11, Fig. 1; *see also id.*, Figs. 2-3, 6:13-28. And the algorithm performed by this software and hardware is consistent with Motorola's construction and describes establishing, tearing down and controlling the bandwidth of the satellite link:

> In a communications environment, dynamic ***trunking elements*** 50 and 52 ***would bring up the*** SatCom link ***when*** a first user logs into the system. Dynamic ***trunking***

*elements* 50 and 52 *would increase the bandwidth* of the link *as* a second and a third user log into the remote location. However, *as* the forth [sic] fourth user logs into the system, dynamic *trunking elements* 50 and 52 *would leave the bandwidth of the link unaltered*, as communication system 10 would not allow more than three users to transmit voice simultaneously (in this example).

*Id.*, 4:38-47; *see also id.*, 3:14-19 (trunking elements also bring down the SatCom link). Accordingly, if STA's construction is adopted, it should be limited to this disclosed algorithm consistent with Motorola's construction. *Core Wireless Licensing S.a.r.l. v. Apple Inc.*, 853 F.3d 1360, 1364-69 (Fed. Cir. 2017).

### 7.    Order of steps (claims 8 and 9)

| STA's Proposed Construction | Motorola's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | The steps must be performed in the recited order. |

STA does not dispute that limitations 8(e)-(h) must all take place in the recited order and after steps 8(a)-(d) are complete, nor could it. STA Br. at 20-21 (listing limitations). For example, steps 8(e) and (h) "increase[e]" and "adjust[]" "*the* bandwidth that is allocat[ed]" in prior step 8(d). Without that initial bandwidth allocation, there is nothing to increase or adjust. In addition, step 8(e) recites "additional presence data for additional users that have joined the communication session," expressly stating that there must already be "users" and associated "presence data." Furthermore, STA does not dispute that limitations 8(g) and (h) must take place in order *and* after all of the other steps because they "detect[] an absence of active users" and then "tear[] down the link based on the absence," completing the '134 Patent's stated goal of "preserv[ing] bandwidth and minimiz[ing] operational costs" by using an "efficient and cost effective trunking system that reserves and brings-up expensive trunks only when needed." '134 Patent, 2:41-43, 2:60-62. It would be nonsensical to perform any of 8(a)-(f) after 8(g)-(h).

STA, however, incorrectly argues that steps 8(a)-(d) can be performed in any order. STA Br. at 19-21. At a minimum, all of steps 8(a)-(d) must be completed before 8(e) (as explained

above), and 8(b)-(d) must be performed in the recited order. For example, limitation 8(b) provides the antecedent basis for "link," which is then recited again in limitations 8(c) and (d). Specifically, limitation 8(d) "allocate[s]" the "bandwidth level to be used for ***the*** link to accommodate ***the*** application." And "the application" of 8(d) is first recited as "an application" in the preceding step 8(c) establishing an express order. *Hytera Commc'ns*, 841 F. App'x at 218; *Altiris*, 318 F.3d at 1369-70. Therefore, STA's argument that "there is no grammatical or logical requirement that they be performed in a particular order" (STA Br. at 19 & 21) is false.

For these reasons, limitations 8(b)-(d) and (e)-(h) must be performed in the order recited, and limitation 8(a)-(d) must be performed to completion prior to 8(e).

## D.   The '664 Patent

The '664 Patent is directed to elevating the priority of important calls (e.g., from a phone or push-to-talk device) received and monitored by a human dispatcher (e.g., in a call management center). The purported improvement of the '664 Patent is a basic human endeavor well-known to dispatchers for years: when an important message arrives with an alert (e.g., "officer down"), elevate the message's priority by adjusting how it is provided (e.g., turn up the volume). As the patent describes, the allegedly inventive concept covers a human dispatcher monitoring media streams (calls) on radio channels and receiving an alert (which could just be a "simple conversational exchange[]"). '664 Patent, 7:41-48. In response, the dispatcher "elevat[es] a priority" such that an adjustment is made to how the media stream is provided, for example, by "simply turn[ing] up the volume" or sending the call to a particular ear. *Id.*, 3:56-64.

### 8.   "media stream[s]"

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a continuous sequence of audio or audio-and-video, which may include associated data, through a network" |

The Court should adopt Motorola's construction of "media stream," which embraces

verbatim the definition from the Microsoft Computer Dictionary, 4th Edition (1999). *See* Ex. I. Dictionaries "are often useful to assist in understanding the commonly understood meaning of words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322 (Fed. Cir. 2005) (en banc). The definition of "media stream" in this dictionary accords with the intrinsic evidence. The claim language and the specification explain that "media streams" include "message" content, with a "volume" (***audio or audio-and-video***), that is intended to be received and deciphered by humans, such as emergency response personnel (requiring, ***a continuous sequence***). *See, e.g.*, '664 Patent, 1:38-41, 3:30-4:9; cl. 2 ("increasing the volume of the media stream"). The "media streams" are also transmitted "in a communication environment" (***through a network***). *Id.* at 3:30-4:9.

STA's criticisms of Motorola's definition are unavailing. Although STA pans the 1999 edition date of the dictionary, STA has no evidence (or argument) that the meaning of "media stream" changed in the intervening years before the 2008 filing date of the '664 Patent application. In any event, the 2008 edition of the same dictionary offers the same definition. *See* Ex. J Microsoft Computer Dictionary, 5th Edition (2002). And the cases cited by STA (STA Br. at 22) in fact support Motorola, as each relied on dictionary definitions to construe the terms at issue. *Atofina v. Great Lakes Chemical Corp.*, 441 F.3d 991, 996 (Fed. Cir. 2006); *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005).

STA next takes issue with the definition because, according to STA, it precludes a stream of "video without audio." STA Br. at 22-23. To be clear, Motorola is not arguing, nor does it understand from the definition, that "video without audio" is precluded; Motorola's construction simply stays true to the dictionary definition. Other than that issue, the parties appear agree that "media streams" refers to video or audio streams. STA Br. at 22 ("Video with audio would constitute 'media streams'…."). To resolve that dispute, Motorola would not object to revising the

construction of "audio or audio-and-video" to "audio or video or both."

As for "continuous sequence," STA does not explain how a randomized or scrambled collection of audio or video would stay true to the plain meaning of "media stream."[5] There is no disclosure of such an understanding of "media stream" in the specification, nor does STA cite any. The essence of the alleged invention is to make the media stream quickly detectable to an emergency responder—and it would be undecipherable if it were provided non-continuously, as STA contends. Thus, a "continuous sequence" is the only construction that stays true to the plain and ordinary meaning and the specification. *See Trs. of Columbia Univ.*, 811 F.3d at 1363 ("The only meaning that matters in claim construction is the meaning in the context of the patent.").

For "in the network," the parties do not appear to meaningfully dispute that a "media stream" is provided "through a network." Motorola's construction simply tracks the language of the definition, but this language is not critical to resolving the dispute between the parties. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding claims need construction "only to the extent necessary to resolve the controversy").

9.      "channels"

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "two or more paths of different priority" |

The Court should construe "channels" as "two or more paths of differing priority" because that construction is fully supported by the intrinsic evidence and gives effect to the surrounding claim language. *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction . . . demands interpretation of the entire claim in context, not a

---

[5] To the extent STA contends that some other type of data stream that does not contain "media" or randomized or scrambled audio or video would be covered by the scope of the claim, Motorola disagrees, and *O2 Micro* necessitates a construction of the term beyond plain and ordinary meaning. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-63 (Fed. Cir. 2008).

single element in isolation."); *Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive.").

Claim 1 recites "monitoring media streams associated with **channels**." The alleged invention involves "a plurality of channels, where **important channels** are rendered to one ear (e.g., the right) and the **less important channels** are sent to the other ear (e.g., the left)." '664 Patent, 3:21-24; Fig. 2. "Important" and "less important" are coterminous with different priorities. *Id.* at 3:50-55 (referring to "non-high priority channel" and "low priority [] channel"). Thus, the essence of the invention, as even STA has admitted, is transmitting a priority message on a priority channel instead of a non-priority channel. *Id.* at 4:1-5 ("the system responds by moving the alert message to the **primary channel** and **marginalizing all the other channels** for a configurable period"); Dkt. 28 at 14 ("Thus, the inventive communication system 'can readily identify' an alert message sent on a **non-priority channel** 'and respond in any number of ways to ensure that the message was properly received.'"); Dkt. 87 at 4 ("The '664 Patent explains that problems arise when a priority message is transmitted on a **non-priority channel**.").

But STA now contends the term "channels" can encompass solely two paths of the **same priority**. STA Br. at 23-24.[6] Not only does this contradict the specification, it contradicts STA's positions when it argued for patent eligibility. Dkt. 42 at 4 ("In other words, the patent discloses and claims a method whereby a system identifies priority messages, even if conveyed over a **low priority channel**, and adjusts the provision of those messages."). This interpretation also fails to give full force to the surrounding claim language. The applicant specifically claimed a process where one channel has a different priority than the other "such that an adjustment is made to how

---

[6] Motorola disagrees—the term "channels" requires at least one path having a different priority— and this dispute over claim scope necessities claim construction. *O2 Micro*, 521 F.3d at 1360-63.

the media stream is provisioned to an endpoint." '664 Patent, cl. 1. In plain speak, the message can

be appropriately relayed to the priority channel, including turning up the volume on that channel.

*Id.*, at 3:55-65, 4:1-5; *see also* cl. 6 ("The method of claim 1, wherein elevating the priority includes

identifying a ***primary channel*** and rendering the alert message to the ***primary channel***."). Thus,

the applicant did not choose to claim a process involving two non-priority channels or two channels

of the same priority—indeed, STA does not explain how, in such a process, "an adjustment" would

be made to provision the media stream to its endpoint if no one channel had a higher priority than

another. STA's construction would result in inoperability of the claimed invention—an extremely

disfavored construction. *See AIA Eng's Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1278 (Fed.

Cir. 2011).

Because Motorola's construction properly reflects the usage of "channels" in the intrinsic

record, it should be adopted. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 794 (Fed. Cir. 2021).

## 10. "endpoint"

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "end-user device capable of exchanging audio or other data in the architecture" |

The Court should construe "endpoint" as "end-user device capable of exchanging audio or

other data in the architecture." STA does not identify any plain and ordinary meaning for the term

"endpoint." The Court should thus look to the specification to determine the meaning of the term.

*Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("Where a claim term has no

ordinary and customary meaning, a court must resort to the remaining intrinsic evidence—the

written description and the prosecution history—to obtain the meaning of that term.").

Fortunately, the applicant clearly and unambiguously defined this term in the specification.

'664 Patent, 2:53-58 ("These devices (***referred to as 'endpoint' as used herein in this document***)

may include VHF radios, UHF radios, PSTN telephones, IP phones, push-to-talk telephones,

cellular telephones, laptops, desktop computers, personal digital assistants (PDAs), or any other suitable **end-user device capable of exchanging audio or other data in the architecture**."). The applicant's "referred to as" language is clearly definitional. *See, e.g.*, *Abbott Lab'ys v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1210 (Fed. Cir. 2007) (explaining "as used herein, means" to be definitional); *Meds. Co.*, 853 F.3d at 1306 (finding "refers to" and "as defined herein" to be definitional); *Kyocera Senco Indus. Tools Inc.*, 22 F.4th at 1378 (finding "referred to herein" to be definitional). Motorola's construction reflects the definition, removing the grammatical references to exemplary devices (what is offset by the "may include" phrase).

STA offers no adequate reason for ignoring this definitional language. Where, as here, STA does not identify an ordinary meaning, "[t]he applicant's use of those terms in the specification thus controls their scope." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004). Neither *Continental Circuits* nor *Merck* help STA, as neither used "referred to" definitional language. *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 796-98 (Fed. Cir. 2019); *Merck & Co.*, 395 F.3d at 1370-72. The Court should thus adopt Motorola's construction.

### 11.   Order of steps

| STA's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| Plain and ordinary meaning | The steps must be performed in the recited order |

Claim 1 recites three sequential steps: first (1) monitoring the media streams; then (2) receiving an alert in one of the monitored streams; and finally (3) elevating a priority based on the received alert. The logic and grammar of the claim and the relevant intrinsic record require the three steps be performed in the recited order, consistent with Motorola's construction. *See Mformation Techs.*, 764 F.3d at 1398.

As shown in the annotated claim below, the "monitoring…" step 1[a] provides antecedent basis for the "receiving…" step 1[b], and the "receiving…" step 1[b] provides antecedent basis for

the "elevating…" step 1[c].

---

1.  A method, comprising:

monitoring *media streams* associated with channels in a communication environment;

receiving *an alert* in one of *the media streams*;

and elevating a priority associated with *the media stream* receiving *the alert*, such that an adjustment is made to how *the media stream* is provisioned to an endpoint in the communication environment.

---

Specifically, the step 1[a] of "monitoring media streams associated with channels in a communication environment" first sets forth various "media streams." Step 1[b] of "receiving an alert in one of the media streams" then refers to "*the* media streams," referring by antecedent basis back to the prior "monitoring" step. Similarly, step 1[c] of "elevating a priority associated with the media stream receiving the alert" refers to "*the* alert," its antecedent from the "receiving" step 1[b]. As a matter of logic and grammar, the media streams must be monitored before an alert can be received, and the priority cannot be elevated until receiving such an alert. The Federal Circuit has repeatedly recognized that antecedent basis as in claim 1 imposes an order of steps, consistent with Motorola's construction. *Hytera Commc'ns*, 841 F. App'x at 218.[7]

The specification also supports an ordered sequence of steps. *See Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (imparting order of steps when every embodiment describes that order and "[n]o disclosure in the specification depicts or discusses the possibility"

---

[7] The additional claim language further reinforces the order of steps. Dependent claims 2-7 explain various ways in which the alleged invention elevates the priority (step 3). Each of those claims refers to the antecedent terms from steps 1 and 2 ("the media stream" and "the alert"). Claim 7 further explains that "elevating" includes "turning a volume down on media streams not receiving the alert"—which shows that "elevating" is a follow-on step that can only be accomplished once an alert is first received.

of a different order). The specification repeatedly describes this order of operations. For example, it explains that the method monitors (step 1[a]) a plurality of channels by "listen[ing] in on a multitude of channels." '664 Patent, 3:35-36. Only after it is listening does it receive and identify an alert message (step 1[b]). *Id.*, 3:46-59. Even further, it explains the "elevating" step is a ***reaction*** to the "receiving" step, necessitating that "elevating" (step 1[c]) follows "receiving" (step 1[b]). *Id.*, 2:10-14 ("The method also includes ***reacting to an alert message*** by adjusting one of the channels for the endpoint."); 3:56-4:9 (identifying various "intelligent responsive mechanism[s]" after an alert is received); *see* Fig. 5, 7:60-8:14. Thus, the specification requires an order of steps.

STA's arguments ignore this intrinsic evidence. STA tellingly discusses only the "monitoring" and "receiving" steps (steps 1[a] and 1[b]), but ignores the "elevating" step 1[c], which is the lynchpin of the ordered sequence. STA Br. at 26. STA also ignores the antecedent basis between all three steps. But even for the two steps that STA does address, it defies both logic and grammar to interpret the claim as receiving an alert "***in*** one of ***the*** media streams" before any media stream is monitored. STA's catchall language (STA Br. at 26) cannot be used to override the purpose of the invention in the intrinsic record. *Akeva L.L.C.*, 208 F. App'x at 863) (finding "catch-all" phrase at end of specification irrelevant when "the specification when read as a whole clearly demonstrates that the scope of the invention is" narrower); *see also D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1051 (Fed. Cir. 2018) ("[B]oilerplate language at the end of the . . . specification is not sufficient to show adequate disclosure of the actual combinations").

Because STA identifies no portion of the specification that justifies ignoring the natural and grammatical order of those steps in claim 1, Motorola's construction should be adopted.

## III.    CONCLUSION

Motorola respectfully requests that the Court adopt its proposed constructions.

Dated: November 3, 2023

Respectfully submitted,

*/s/ Robert L. Maier*

Melissa Richards Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
**GILLAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
(903) 934-8450

Robert L. Maier
New York Bar No. 4123246
robert.maier@bakerbotts.com
Michael E. Knierim
New York Bar No. 5034830
michael.knierim@bakerbotts.com
Stephen O'Donohue
New York Bar No. 5231246
stephen.odonohue@bakerbotts.com
Frank Zhu
New York Bar No. 5557822
frank.zhu@bakerbotts.com
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500

Katharine M. Burke
DC Bar No. 985333
katharine.burke@bakerbotts.com
Lauren Dreyer
DC Bar No. 1007189
lauren.dreyer@bakerbotts.com
Samuel Kassa
DC Bar No. 187255
samuel.kassa@bakerbotts.com
**BAKER BOTTS L.L.P.**
700 K Street NW
Washington, DC 20001
(202) 639-7700

M. Natalie Alfaro Gonzales

Texas Bar No. 24069286
natalie.gonzales@bakerbotts.com
**BAKER BOTTS L.L.P.**
910 Louisiana Street
Houston, TX 77002
(713) 229-1318

*Attorneys for Defendant*

## __CERTIFICATE OF SERVICE__

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 3rd day of November, 2023.

Dated: November 3, 2023

*/s/ Robert L. Maier*
Robert L. Maier